Hon. Ronald B. Leighton

Walter E. Barton, WSBA # 26408
Karr Tuttle Campbell
1201 Third Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 223-1313
Fax: (206) 682-7100

Kathleen M. Balderston, NY Bar #2252534
Admitted Pro Hac Vice
Nixon Peabody LLP
437 Madison Avenue
New York, New York 10022
Telephone: (212) 940-3000
Fax: (212) 940-3111

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR WESTSOUND BANK, | ) ) ) ) NO.  3:11-cv-05953-RBL |
| Plaintiff, | ) FIRST AMENDED COMPLAINT FOR ) GROSS NEGLIGENCE, NEGLIGENCE ) AND BREACH OF FIDUCIARY DUTY |
| v. | ) |
| DAVID K. JOHNSON, BRETT T. GREEN, LOUIS J. WEIR, DEAN M. REYNOLDS, RODNEY R. PARR, LARRY C. WESTFALL, RICHARD N. CHRISTOPHERSON, DONALD F. COX, JR., JAMES H. LAMB, BRIAN B. MCLELLAN, and DONALD H. TUCKER, | ) JURY DEMANDED ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

### FIRST AMENDED COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation, as Receiver for Westsound Bank ("FDIC"), for its First Amended Complaint, states as follows:

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

## INTRODUCTION

1.      The FDIC brings this case in its capacity as Receiver for Westsound Bank ("Westsound" or "Bank"), pursuant to its authority granted by 12 U.S.C. § 1821.  The FDIC seeks to recover at least $15 million in losses that the Bank suffered on thirty-four loans approved between May 16, 2006, and closure of the Bank.  Defendants – eleven of Westsound's former directors and/or officers – caused such loss by failing to properly manage and supervise Westsound and its lending function, by failing to approve loans in the manner required under the Bank's loan policy ("Loan Policy"), and by approving loans that did not warrant approval.

2.      The FDIC specifically seeks recovery for losses on (1) seven acquisition, development, and construction ("ADC") and commercial real estate ("CRE") loans approved by members of the Directors Loan Committee ("DLC") in violation of the Bank's Loan Policy and in disregard of regulatory warnings (the "DLC Loss Loans"); (2) twenty construction loans to the local Russian/Ukrainian community originated by Teresa Feller ("Feller"), the Branch Manager of the Bank's Federal Way Office, that never would have been approved if the Defendants had heeded regulatory warnings and properly supervised the Bank's lending function to ensure compliance with loan policies and sound underwriting principles (the "Feller Loss Loans"); and (3) seven loans granted to directors and director-related companies at preferential rates and terms without prior Board approval, in violation of 12 U.S.C. § 375b and corresponding FDIC Rules and Regulations including Regulation O (12 C.F.R. Part 215) (the "Insider Loss Loans") (collectively, the "Loss Loans"). The approval of and/or failure to supervise the approval process for the Loss Loans, as well as numerous other improper acts by the Defendants discussed herein, were the direct and proximate cause of the Bank's losses.  The Complaint alleges claims of breach of fiduciary duty, negligence, and gross negligence.

3.      Westsound was an FDIC-supervised state nonmember bank that was insured by the FDIC on March 12, 1999.  Westsound opened its headquarter branch in Bremerton, Washington, and grew to have nine branches in and around Kitsap County, Washington.

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 2
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Westsound was 100-percent owned by the Westsound Financial Group, Inc., which was publicly traded (the "Holding Company").

4.      The Defendants are eleven former directors and officers of the Bank. Defendants Johnson and Green were the President and Chief Executive Officer ("CEO") and the Executive Vice President of Sales and Lending, respectively; and both were members of the DLC.  Johnson also sat on the Board of Directors.  Defendants Weir, Reynolds, Parr and Westfall were members of the Board of Directors and the DLC ("DLC Directors").  Defendants Christopherson, Cox, Lamb, McLellan and Tucker were outside members of the Board of Directors.

5.      In connection with a decision to take the Bank's Holding Company public, the Defendants (with the exception of Defendant Cox, who was not yet on the Board) implemented an aggressive growth strategy that soon resulted in a portfolio with significant concentrations in higher-risk ADC and CRE loans.  Defendants increased the Bank's already high risk exposure by implementing policies and procedures void of the most basic prudent lending controls and neglecting to adequately supervise lending personnel.  By September 2007, concentrations in ADC and CRE lending far exceeded regulatory thresholds.

6.      Beginning in 2005, those Defendants decided to aggressively pursue residential mortgage lending.  In connection therewith, the Federal Way branch was opened and Feller was hired to head that branch.

7.      From the end of 2005 until she was fired in August 2007, Feller, in collusion with non-Bank employee Aleksandr Kravchenko, borrowers and several appraisers, manipulated financial information as well as appraisals and loan documentation in order to gain approval for at least 120 residential construction loans to the local Russian/Ukrainian community, which loans were made on generous terms not justified by the borrowers' financial condition or the true nature of the loans.

8.      The Defendants not only failed to implement policies to prevent such abuse of lending, but put policies in place, including the Loan Originator Compensation Policy, that incentivized poor lending practices.  Particularly, the Loan Originator Compensation Policy

1  allowed Feller, an employee who earned $125,000 in salary from July 2005 to August 2007, to

2  earn an additional million dollars in commissions during that same time period.

3      9.    State and federal regulators repeatedly warned the Defendants of the increasing

4  risks associated with the Bank's excessive growth rate, heavily concentrated loan portfolio, and

5  lax oversight and control of the lending function.  The Defendants had actual notice of these

6  risks and a growing awareness of adverse changes in the real estate market but made little or no

7  effort to diversify the Bank's real estate portfolio, enhance oversight of the lending function or

8  otherwise mitigate the increased risk they had created by following a growth-at-all-cost

9  strategy.  Instead, Defendants continued to choose short-term profits over prudent lending by,

10  among other things, approving and/or failing to supervise the approval and administration of

11  the Loss Loans.

12      10.    The Loss Loans, at the time of approval, (1) increased previously criticized loan

13  type concentrations, (2) violated the Loan Policy and applicable laws and regulations, and/or

14  (3) lacked proper financial analysis or verification of the creditworthiness of the borrower

15  and/or guarantor, and/or (4) lacked proper financial analysis or verification of the value of the

16  collateral.  Further, as the economy soured, rather than exercising prudence in restricting high

17  risk lending and preserving the Bank's capital, the Defendants instead took actions designed to

18  mask the size and extent of the Bank's troubled assets and otherwise further worsened the

19  Bank's mounting problems.  They approved additional Loss Loans and renewed and/or made

20  further loan advances on non-performing Loss Loans.  These ill-advised measures were only a

21  temporary stopgap, however, and the Loss Loans were not repaid, resulting in over $15 million

22  in losses to the Bank.

23      11.    The Washington State Department of Financial Institutions ("WADFI") closed

24  Westsound on May 8, 2009, and appointed the FDIC as Receiver.  Westsound failed with

25  $334.6 million in assets.  The loss of Westsound's failure to the Deposit Insurance Fund is

26  currently estimated at $106.4 million.

27

28

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 4
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

### THE PARTIES

#### I.   Plaintiff

12.     Plaintiff, Federal Deposit Insurance Corporation, brings this case in its capacity as Receiver for Westsound Bank, pursuant to its authority granted by 12 U.S.C. § 1821.  The FDIC was appointed Receiver on May 8, 2009, following the closure of the Bank by the WADFI.  The FDIC has the right to pursue all of the Bank's claims, including claims against each of the Defendants herein.

#### II.   Defendants

13.     Defendant David K. Johnson ("Johnson") joined the Bank in 2000 as its President and CEO, and served on the Board of Directors from October 2006 until he resigned in February 2008.  He also served on the DLC in his capacity as President and CEO of the Bank.

14.     Defendant Brett Green ("Green") was the Bank's Executive Vice President of Sales and Lending from November 10, 2003, until he resigned in September 2007 subsequent to the discovery by regulators of the Feller loan scheme.  Green also sat on the DLC in his capacity as EVP of Sales and Lending.

15.     Defendant Louis Weir ("Weir") was the Chairman of the Board of Directors for Westsound, and served on the DLC from 1999 to March 2008.

16.     Defendant Dean Reynolds ("Reynolds") was the Chairman of the DLC, and served on the Board and the DLC from 1999 to failure.

17.     Defendant Rodney Parr ("Parr") served on the Board and the DLC from 1999 to July 2006.

18.     Defendant Larry Westfall ("Westfall") served on the Board and the DLC from 1999 to failure.

19.     Defendant Richard Christopherson ("Christopherson") served on the Board from 1999 to failure.

20.     Defendant Donald Cox, Jr. ("Cox") served on the Board from January 2007 to failure.

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 5
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

21.     Defendant James Lamb ("Lamb") served on the Board from 1999 to failure.

22.     Defendant Brian McLellan ("McLellan") served on the Board from 1999 to March 2008, when he resigned from the Board to become the Bank's Business Development Officer, serving in this position until the Bank failed.

23.     Defendant Donald Tucker ("Tucker") served on the Board from 1999 to failure.

### JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1345.

25.     This Court has personal jurisdiction over Defendants Green, Weir, Reynolds, Parr, Westfall, Christopherson, Cox, Lamb, McClellan, Johnson and Tucker, all of whom are residents of the district in which the Court is situated and/or who at all relevant times conducted the business of Westsound in the State of Washington.   This Court also has personal jurisdiction over each of the Defendants named in this action, pursuant to Revised Code of Washington §§ 4.28.185(1)(a), (b) and/or (c).

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the FDIC's claim occurred in this district.

### FACTUAL BACKGROUND

**I.     Defendants Recklessly Pursue A High-Risk Lending Strategy**

**A.     The Westsound Loan Policy**

27.     The Board of Directors adopted Westsound's Loan Policy on November 19, 2001, and revised it in September 2006.  Under the Loan Policy, the Officer's Loan Committee was authorized to approve loans up to $100,000, and the DLC was required to approve loans in excess of $100,000 and up to the Bank's legal lending limit.  Each of the Feller Loss Loans was for amounts greater than $100,000, but only one of the 20 was presented to the DLC for approval, in violation of the Loan Policy.

28.     The Loan Policy on Insider Transactions required that the Insider Loans had to be approved in advance by the full Board, with the borrower abstaining from voting.  Insider

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 6
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Loans were to "[b]e made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for non-insiders on comparable transactions" and could "[n]ot involve more than the normal repayment risk."

29.     None of the seven Insider Loans were presented to the full Board for approval. All were made on preferential terms and bore more than the normal repayment risk in violation of the Loan Policy and applicable laws and regulations.

30.     The Loan Policy gave the Board responsibility for "establishing standard[s] for review and approval" of loans that "do not fit within Westsound Bank's general lending policy." Loans of "a significant size" that were exceptions to the Loan Policy were to be monitored to ensure general compliance with the Loan Policy and were required to be reported to the Board.

31.     Each of the seven Loss Loans approved by the DLC involved one or more exceptions to policy, including (1) Loan To Value ("LTV") ratios (the ratio of loan amount to value of collateral) that exceeded the maximum allowed, (2) failure to require the minimum level of borrower equity, (3) failure to meet required debt coverage ratios, and/or (4) failure to obtain meaningful appraisals, borrower or guarantor financial information. Pursuant to the Loan Policy, the DLC had an obligation to report such exceptions to the Board, yet routinely failed to do so in further violation of the Loan Policy.

**B.     Defendants' Lax Supervision of Loan Underwriting and Administration**

32.     Westsound's lending procedures, geared to accommodate an unsafe rate of growth, lacked appropriate checks and balances and rewarded irresponsible lending. In violation of the Bank's Loan Policy, in or around April 2005, the Defendants informally adopted lending procedures that delegated virtually all of their responsibilities over Westsound's residential construction lending function to lower level underwriters and loan officers, and permitted use of an automated system to approve loans.

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 7
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1.    **Defendants Improperly Relied on an Automated System for Approval of Loans that Should Have Been Reviewed by the DLC**

33.    Under Defendant Green's direct supervision, Feller was allowed to improperly use an automated underwriting system ("AUS") to obtain approvals for large residential construction loans.  Although AUS was meant to be used to determine if a loan would qualify for permanent "take out" financing upon completion of the construction, Feller was allowed to use it as a substitute for DLC approval for the construction loans themselves.  This process generally involved Westsound underwriters at the Federal Way branch punching numbers provided to them by Feller into the system in order to determine whether a residential construction loan should be approved.  With no stake in the long term success of the loan, Feller focused primarily on manipulating applications to obtain their approval rather than providing a complete and objective overview of the underlying factors, both good and bad, that should have been considered during Westsound's loan approval process.  In many instances, Feller resubmitted the same loan with adjustments to the borrowers' relevant financial information or other parameters until loans were "automatically" approved.  The consequences of this improper system were severe; Feller obtained approvals for at least 120 residential construction loans to the Russian/Ukrainian immigrant community over her approximately two years of employment, which led to multiple millions of dollars in write-offs.

34.    The switch to underwriter and/or officer approval on large residential construction loans meant that the layers of review of Westsound loans required by the Bank's Loan Policy were stripped away.  This lack of meaningful review contributed to the approval of an increased number of high-risk, problematic loans.

2.    **Westsound's Loan Originator Compensation Policy, Promoted High-Volume, High-Risk Loans Over Quality Loans**

35.    The problems inherent in collapsing the approval process were made worse by the Bank's loan originator compensation policy, under which loan officers earned commissions based on the volume of loan originations/renewals, with no consideration given to the quality

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

of the loan and/or the loan's ultimate performance.  All of the Defendants (with the exception of Cox who was not yet on the Board) recklessly failed to adequately supervise the design of this incentive compensation program.  Moreover, despite the heightened potential for abuse under this flawed structure, these Defendants recklessly failed to implement greater control over the Bank's lending function.

36.     Further, Defendants saw monthly reports of commissions earned by Bank employees including Feller, and were well aware of the size of her commissions.

37.     Defendants knew or should have known that the Bank's loan originator compensation policy was in violation of FDIC rules and regulations concerning compensation and constituted an unsafe and unsound banking practice.

### 3.     DLC Defendants Failed to Properly Approve Loans

38.     For loans that went to the DLC for approval, the DLC Defendants improperly relied upon write-ups for each loan prepared by loan officers, which often involved nothing more detailed than a pro forma Loan Application with largely unverified information.  On their face, these loan write-ups lacked the detailed analysis of the creditworthiness of prospective borrowers and/or guarantors that is required by prudent banking practices.  Yet, the DLC Defendants approved loans, ignoring the clear deficiencies in information provided them regarding the borrower's ability to repay the loan, and either ignoring or failing to substantively address numerous exceptions to Loan Policy when voting to approve the loans.

39.     In keeping with its focus on quantity over quality, the Bank often attracted borrowers by offering interest-only loans secured almost entirely by the real estate/project being financed.  Additionally, the Bank further heightened its risk by allowing the interest payments on these loans to be funded almost exclusively by Bank-financed interest reserves established at origination.  When loans neared maturity with little evidence that the borrowers had the wherewithal to pay off the loan, the DLC Defendants routinely approved renewals and financed additional funding for interest reserves.  This lending structure required little or no borrower equity in the collateral or money out of pocket over the life of the loan, thus leaving the Bank with all of the risk if the project was not successfully completed and sold.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

### 4. Defendants Failed to Implement Appropriate Policies and to Properly Supervise ADC and CRE Lending

40.     The increased risk created by the Bank's large ADC and CRE concentration was compounded by the Defendants' failure to implement and enforce sound policies and procedures.   The lack of checks and balances in the Bank's lending procedures and inappropriate loan volume incentives led to chronic and unremedied underwriting and administration deficiencies, including inadequate borrower/guarantor financial analysis, defective appraisals, excessive LTV ratios, untimely recognition of problem loans and improper use of loan proceeds, all of which created large losses for the Bank.

41.     As Defendants knew, or should have known, ADC and CRE lending are specialized fields with unique risks that require thorough understanding and close management. Management's ability to identify, measure, monitor and control portfolio risk through effective underwriting policies, systems, and internal controls is crucial to sound ADC and CRE lending.

42.     The Board of Directors is responsible for establishing appropriate risk limits, monitoring exposure, and evaluating the effectiveness of an institution's efforts to manage and control risk.  Defendants failed to implement or administer a sufficient Loan Policy for CRE lending, despite repeated criticism from Regulators.

43.     ADC and CRE loans were largely "collateral dependent," meaning the principal source of repayment was the sale of the project.  Without assurance that such sales would take place, the Bank ran the additional risk that even if projects were completed, loans might not be repaid.  Additionally, assessing the sufficiency of the collateral to support its ADC and CRE loans was particularly critical to Westsound, given the collateral dependency of its ADC and CRE loans.  Defendants allowed a culture to flourish where the Loan Policy was frequently violated regarding appraisals, despite having received regulatory criticism for non-compliance with regulatory standards relating to appraisals.  Among other things, Westsound developed a concentration of ADC and CRE loans with a large volume of excessive loan-to-value ("LTV") ratios, meaning the loan amount was dangerously close to the estimated total future value of the collateral based on an "as completed" appraisal.  Westsound's own Loan Policy provided that

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

CRE loans should not exceed 85% of the value of the property.  Notwithstanding its policy, Westsound often exceeded those limits.  As a result, the borrower's equity at risk in the project was often dwarfed by the Bank's loan amount, which, consequently, meant that the Bank had the most to lose if the project was not successfully completed.

44.    Loan presentations prepared for the DLC often included estimated LTV ratios based on the projected total future value of the collateral as opposed to current market value.  The DLC's reliance on speculative "as developed" values greatly overstated the equity cushion designed to insulate against decreasing property values.

45.    The true nature and extent of these underwriting deficiencies were often masked by the Bank's excessive use of interest reserves.  Defendants permitted generous "interest-carry" provisions in high-risk loans, which masked liquidity and delinquency problems of some borrowers by preventing the loans from becoming past due, which in turn prevented an accurate assessment of the quality of these loans.

46.    All Defendants failed to implement or supervise an effective system to monitor ADC and CRE loans to determine if the projects continued to be feasible based on their original underwriting.  The Loan Policy required that the progress of the project be monitored to determine whether the percentage of funds disbursed is consistent with the percentage of the project's completion.  Bank officers and directors who approved the credits were routinely either unaware of whether loans were out of balance, or tolerated the condition without requiring additional borrower contributions, practices that made these loans even riskier.  In certain instances, Bank officers and directors permitted draws on construction loans for non-construction-related purposes.

C.    **Defendants Repeatedly Ignored Regulatory Criticism as They Increased the Bank's Risk**

47.    State and federal regulators consistently raised concerns about Westsound's excessive growth rate to the Board and the Bank's management.  Regulators repeatedly identified risks and deficiencies in Westsound's Loan Policy and lending function, which

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1   continued to grow in both number and severity because of the Defendants' failure to take

2   adequate corrective measures.

3       48.   Regulators began cautioning the Defendants regarding the Bank's rapid growth

4   rate in early 2006.  In addition to cautioning against the Bank's rapid growth, this report also

5   specifically criticized the Bank's large numbers of high-LTV ratio loans and high

6   concentrations in ADC and CRE loans which had resulted in an increased risk profile.  The

7   high-LTV ratios resulted in significant part from the Bank's criticized practice of extending

8   credit with little or no borrower equity and the Bank's lax practices in obtaining appropriate

9   appraisals of the subject properties.

10       49.   FDIC examiners held a meeting at the Bank on February 24, 2006 to discuss the

11   findings of the February 2006 FDIC Report of Examination ("RoE").  That meeting was

12   attended by Defendants Johnson, Green and Westfall.  The RoE was then provided to all Board

13   members and discussed at the Board meeting on March 21, 2006.  Present at this meeting were

14   Defendants Reynolds, Lamb, Parr, Tucker, Weir, McLellan, Christopherson, Westfall, Johnson

15   and Green.  The February 2006 RoE was signed on that date by Defendants Christopherson,

16   Lamb, McLellan, Parr, Reynolds, Tucker, Weir, and Westfall.

17       50.   The 2006 RoE noted the rapid growth rate of the Bank portfolio's risk profile,

18   singling out the high concentrations in CRE, ADC and construction loans and the large volume

19   of high LTV credits.  The RoE also discussed Bank management's practice of extending credit

20   with little to no borrower equity, noting that such practice creates risk and had resulted in a

21   high number of LTV exceptions on loans which were in excess of regulatory guidelines.

22       51.   The 2006 RoE also cautioned that, despite the growth in volume and complexity

23   of the loan portfolio, there had not been sufficient modification of lending practices and

24   policies to address these changes, particularly with respect to construction and commercial real

25   estate lending.  Due to the growth and risk of the loan portfolio, the regulators felt the credit

26   policy was insufficient.  In response, Johnson agreed to improve the credit policy.  Despite

27   Johnson's assurances in this regard, the Defendants failed to make any effective revisions to the

28   Loan Policy.

52.     The WADFI February 2007 RoE was presented to the Bank at a meeting of the Board of Directors on March 27, 2007.   Defendants Weir, Westfall, Lamb, McLellan, Christopherson, Reynolds, Cox, Tucker and Johnson were present at the March 27th meeting. On May 16, 2007, the February 2007 RoE was signed by Defendants Christopherson, Cox, Johnson, Lamb, McLellan, Reynolds, Tucker, Weir and Westfall.

53.     In the February 2007 RoE, the WADFI noted significant deterioration in asset quality.   Loan production from the Federal Way branch, where all of the Feller Loans were originated, and at which branch the Feller Loans constituted the vast majority of lending, was singled out for its risky construction lending practices.   The Bank's strategic plan was found to be overly aggressive, and the Bank's Management component of its CAMELS rating dropped to a 3.

54.     The acronym "CAMELS" refers to the six components of a bank's condition that are assessed: Capital adequacy, Asset quality, Management, Earnings, Liquidity and Sensitivity to market risk.   Ratings are assigned for each component in addition to the overall rating of a bank's financial condition. The ratings are assigned on a scale from 1 to 5.

55.     Within this scheme, Banks with composite ratings of 1 or 2 are considered to present few supervisory concerns, while banks with ratings of 3, 4, or 5 present moderate to extreme degrees of supervisory concern.   Institutions with a rating of 3 or worse are examined more frequently, generally receive closer supervision, pay higher deposit insurance premiums, and may face some legal restrictions on their activities.   Accordingly, once a bank receives a rating of 3 or worse, the outside directors have an enhanced duty to become involved in the affairs of the institution.   Moreover, within the composite rating, a component rating of 3 or worse creates a heightened degree of concern.

56.     The February 2007 RoE noted that adverse findings concerning underwriting and credit administration were a poor reflection on management and the Board.   Risk management practices needed improvement.

57.     The February 2007 RoE also criticized the Feller Loans for being granted on a stated income basis, which the regulators felt was inappropriate, particularly because of the

large loan amounts approved on construction lending. A loan is based on "stated income" where the Bank relies on the borrower's representation as to its income. The risk inherent in a stated income loan is obvious: the borrower may exaggerate or inflate its "income" to enhance its prospects of obtaining a loan for which it is not qualified. For this reason, stated income loans are sometimes referred to as "liar loans" in the financial industry.

58.     Feller's loans were also criticized in the February 2007 RoE for lack of borrower equity in the projects, lack of financial statements or tax returns, failure to corroborate high income, and granting extensions to the borrower with no updated financial analysis or constraints on the loan.

59.     The February 2007 RoE noted that the majority of loans reviewed showed documentation exceptions, including missing or out-of-date financial statements, tax returns and rent rolls along with issues pertaining to insufficient documentation concerning collateral.

60.     Although the Loan Policy had been revised, it was still ineffective. The February 2007 RoE advised management to implement additional training and procedures to prevent the numerous recurring policy violations noted by the regulators in the RoE.

61.     The WADFI specifically warned that both Westsound's underwriting and loan monitoring practices were deficient without regard to the economic climate. Management had, on its own, recognized few, if any, of the issues surrounding the adversely classified and Special Mention loans addressed in the RoE. The DLC, tasked with reviewing nearly all loan requests, allowed unacceptable underwriting and monitoring to continue. The RoE indicated that certain loans were made without collateral appraisals in violation of FDIC Rules and Regulations.

62.     At a special meeting on August 10, 2007, the Board learned that regulators had received an anonymous tip about potential wrongdoing concerning the Feller Loans and had started an investigation.

63.     Further criticisms of the Feller Loans and continued deterioration of the Bank's financial condition were detailed in the October 2007 joint RoE. The Board was presented with the October 2007 RoE on February 19, 2008, where the Board acknowledged receipt of the

1    RoE and reviewed the report in its entirety.  Defendants Weir, Westfall, Lamb, McLellan,

2    Christopherson, Reynolds, Cox and Tucker were present at this meeting.  Both the composite

3    CAMELS and component Management ratings were downgraded to a 4, with examiners

4    concluding that management performance was insufficient and the Board was lax in performing

5    its roles in overseeing and supervising the Bank.  Further, Management continued to make poor

6    decisions in selecting what credit to extend, placing a premium on volume at the expense of

7    sound banking practices.

8         64.    With respect to the Federal Way branch, the examiners indicated that Board

9    supervision over construction lending was basically nonexistent, allowing Feller to operate

10   unfettered and to originate a high volume of deficient construction loans.

11        65.    Loans obtained by borrowers working with Feller were again criticized for their

12   inadequacies, including the fact that about half of these loans were granted on a stated income

13   basis, while others supported income levels with information contained in unsigned tax returns.

14   The reported income on these loans appears to have been substantially overstated, and it was

15   uncertain whether the borrowers could actually afford the properties.  Further, the October

16   2007 RoE noted that comparisons of borrower's current house payments to their proposed

17   payments showed an unreasonable payment increase.

18        66.    The October 2007 RoE also discussed Kravchenko's involvement in the Feller

19   Loans, noting that Kravchenko often purchased properties, placing down payments of $10,000

20   to $15,000, and then assigned his interest in those properties to others who subsequently sought

21   and obtained loans from the Bank.  Kravchenko or his related entities frequently charged a

22   "Development Fee" of between $10,000 and $15,000 to these borrowers, ostensibly for

23   activities such as permit review or performance of a feasibility study.  However, the Bank's

24   files did not contain any such permit reviews or feasibility studies on the subject loans.  The

25   RoE noted that management ignored concerns over Kravchenko's role in these loans, and

26   continued to do business with him, even approving three residential construction loans for

27   which he was the Borrower.

28

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

67.     The DLC was criticized for poor oversight and poor decisions.  Because the mortgage department was tasked with originating the Feller Loans, the DLC was, in direct contravention of the Loan Policy, not part of the approval process for those loans.  Further, the Defendants (with the exception of Parr who had left the Board by this time) eliminated the Bank's mortgage department in the middle of the October 2007 regulatory examination, a move criticized by regulators as poorly planned and executed, since the Bank did not ask departing loan officers to document project status in order to properly transition the loan files.

68.     The regulators also criticized the Bank's monitoring and administration of construction loans, as inspections did not sufficiently document construction progress and draws were not adequately supported or documented.  The October 2007 RoE noted that borrowers were permitted to use construction loan funds for purposes other than completion of their property, with checks being written to car dealerships, credit card companies, private schools and department stores.

69.     Despite the fact that Loan Policy revisions were recommended by regulators as early as February 2006, the Loan Policy continued to be inadequate and did not sufficiently support the Bank's construction and land development practices.

70.     Bank examiners also concluded that the Bank's commission program could be seen as "Compensation that Constitutes an Unsafe and Unsound Practice" in violation of Part 364, Appendix A, Section III of the FDIC Rules and Regulations, and the WSB commission system was criticized by the examiners for providing excessive incentives that contributed to the increased volume of high-risk construction loans.

71.     On March 10, 2008, the FDIC issued a Cease and Desist ("C&D") Order requiring the Bank to stop operating with a Board that "has failed to provide adequate supervision over and direction to the active management of the Bank" and "with management whose policies and practices are detrimental to the Bank and jeopardize the safety of its deposits."  The FDIC also directed the Bank to stop using unsafe and unsound incentive compensation programs that could lead to material financial loss.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

72.     The August 2008 joint RoE revealed further deterioration in the Bank's financial performance.  The cascading effect of the poor credit quality of borrowers wiped out earnings, reduced capital, and severely strained the Bank's liquidity position.  Westsound was closed on May 8, 2009.

73.     Each Defendant, during his specific tenure at the Bank, knew about the past regulatory criticisms and warnings and the need to take corrective actions, but knowingly chose not to heed those warnings.

74.     As noted in the October 2007 RoE, management overemphasized asset growth in a manner that minimized the importance of sound credit administration.  The Bank's lending was severely weakened by the poor credit administration practices and contributed to the drastic deterioration of quality in the Bank's assets.

## II.     The Defendants Were Negligent and Breached Their Duties In Failing to Supervise the Feller Loss Loans

75.     Feller originated at least 120 loans in the amount of $118 million to the Russian/Ukrainian immigrant community between July 2005 and August 2007.  These loans were tainted with irregularities, involved alarmingly high rates of default, and have resulted in millions of dollars of loss to the Bank.

76.     Approximately one half of the 120 loans originated by Feller were stated-income loans, in which a borrower described his or her monthly income without the Bank requiring any documentary support to confirm such information.

77.     All Defendants except Parr (who left the Board in July 2006 and thus was not on the Board during the 2007 time period relevant to the Feller Loss Loans) were grossly negligent in failing to supervise the lending program to the local Russian/Ukrainian community at the Federal Way branch after specific regulatory criticism of the Feller Loans by examiners at an examination exit meeting in March 2007.

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 17
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

78.   The 20 Feller Loss Loans upon which the FDIC seeks damages are as follows:

| Borrower | Original Loan Date | Original Loan Amount |
|---|---|---|
| 1.   Nikolay Kozlov | 4/17/07 | $1,183,000 |
| 2.   Anatoliy Seletskyy | 4/20/07 | $2,000,000 |
| 3.   Aleksander Prokhor | 4/30/07 | $1,700,000 |
| 4.   Andrey Kramarevskiy | 5/1/07 | $1,950,000 |
| 5.   Dmitriy Tislenok | 5/22/07 | $750,000 |
| 6.   Vladimir Tyshkun | 5/24/07 | $640,000 |
| 7.   Oleg Nesteruk | 5/31/07 | $2,000,000 |
| 8.   Alexandre Glazkov | 5/31/07 | $1,090,000 |
| 9.   Vladimir Grib | 6/11/07 | $1,240,000 |
| 10. Aleksandr Mikityuk | 6/29/07 | $1,160,000 |
| 11. European Dream | 7/02/07 | $1,953,900 |
| 12. Wilburn/Gulchuk | 7/13/07 | $538,000 |
| 13. Vitaliy Voytovich | 7/13/07 | $1,770,000 |
| 14. Pavel Maslov | 7/20/07 | $2,015,000 |
| 15. Viktor Kondratyev | 7/20/07 | $1,875,000 |
| 16. Andrey Kozorezov | 7/23/07 | $1,440,000 |
| 17. Mikhail Karpenko | 7/26/07 | $905,000 |

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

| Borrower | Original Loan Date | Original Loan Amount |
|----------|-------------------|----------------------|
| 18. Svyatoslav Cherevach | 7/30/07 | $1,905,000 |
| 19. Ilya Piatnitsky | 7/31/07 | $1,195,000 |
| 20. Andriy Havlytyuk | 8/13/07 | $1,548,750 |

79.    On March 27, 2007, five FDIC and state examiners met with the Board to conduct the exit meeting for the February 2007 WADFI examination.  At the meeting, the examiners announced to the Board that they were recommending a downgrade in the Bank's Management Rating to a 3, an unsatisfactory rating.  Defendants Weir, Westfall, Lamb, McLellan, Christopherson, Reynolds, Cox, Tucker and Johnson were present at the March 27th meeting.

80.    The regulators warned that the Bank's rapid growth had created problems for the Bank.

81.    The examiners expressed specific concern about borrowers coming out of the Federal Way location, stating that, according to Board minutes, the Bank was in a "high risk zone with these Borrowers."  The regulators were referring to the borrowers on the residential construction loans made by Feller to the Russian/Ukrainian immigrant community.

82.    The Defendants knew that the overwhelming majority of loans from the Federal Way branch were originated by Feller.

83.    After hearing the regulators' concerns about the management of Westsound and the explicit concerns about the Feller lending, the directors should have informed themselves about the Federal Way/Feller lending program.

84.    The examiners advised the Defendants that they should not be making loans on a stated income basis.

85.    Prior to leaving, the examiners stressed that "the bank needs to be examined more closely by the directors during meetings."

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

86.     As President and CEO of Westsound, Defendant Johnson was responsible for ensuring that a concentration of loans such as the Feller Loans, which accounted by March 27, 2007 for a sizable portion of the Bank's loan portfolio, were being made in accordance with the Loan Policy and applicable laws and regulations.  He failed to do so.

87.     As Executive Vice President of Sales and Lending and Feller's direct supervisor, Defendant Green was responsible for ensuring that Feller was originating loans in accordance with the Loan Policy and applicable laws and regulations.  He failed to do so.

88.     After the examiners left the meeting, Defendant Johnson advised the Board that the criticized Feller loans were expected to be off the books within six to eight months. Defendant Johnson and the Board knew or should have known at that time that this was impossible.

89.     After hearing the regulators' concerns about the management of Westsound and the explicit concerns about the Feller lending, the directors should have informed themselves about the Federal Way/Feller lending program.

90.      Despite the clear regulatory criticisms presented to the Board in March 2007, none of the Defendants took any steps to learn if the residential construction lending program at the Federal Way branch adhered to the Bank's Loan Policy.

91.     As a result of the Defendants' reckless failure to investigate the loans being made by Feller, another 20 Feller Loss Loans in the amount of $30 million (the loans identified in Paragraph 78) went out the door within a roughly four month time period after the March 27th meeting.

92.     Had Defendants Weir, Westfall, Lamb, McLellan, Christopherson, Reynolds, Cox, Tucker and Johnson taken the examiners' criticisms seriously and begun an investigation into the Feller Loans, they would have learned that the loans' generous terms were not justified by borrower financials or the true nature of the loan.  They would have also seen the indicia of wrongdoing described above.

93.     The majority of the Feller Loss Loan files contain multiple versions of loan applications, with different values for various categories of borrower information.

94.     Additionally, a number of the Feller Loss Loans were granted using unsigned tax returns as evidence of income.  Often, there were multiple versions of the same year's tax return in a borrower's file, each with different adjusted gross incomes.  Numerous loan files contain different versions of unsigned tax returns for the same year.  Further, a number of borrowers deny that they provided Westsound with certain versions of unsigned tax returns found in their files.  Upon information and belief, at least one borrower met with Defendant Johnson after his loan went into default.  Upon being shown tax returns in his file, the borrower advised Defendant Johnson that certain tax returns were not his.  Defendant Johnson agreed then to extend the loan, and, on information and belief, did not advise the regulators of what he had learned.

95.     The borrowers on the Feller Loss Loans were generally in their twenties or thirties and self-employed in the construction trade; yet they were qualifying at Westsound for construction loans that often well exceeded one million dollars.  Among other problems, these borrowers were not required to make down payments, and were not even required to make interest payments out-of-pocket.  Rather, interest on the Feller Loss Loans was typically paid directly from the loan proceeds ("interest carry").

96.     Appraisals used to support approval of loans were based upon "as built" valuations, in situations where the evidence indicates that the proposed borrower had not even submitted building plans.

97.     A number of the Feller Loss Loans, while listed as owner-occupied refinancings on the initial loan applications, with accompanying lower interest rates, were actually construction loans for "spec" homes.  Many homes were never completed.

98.     The differences between prospective borrowers' current monthly housing expense and the proposed monthly housing expense on the new "primary residence" were often astronomical – the anticipated change in the borrowers' housing payments per month averaged an increase of over 500%.

99.     Kravchenko, while not an employee of the Bank, was involved in bringing virtually all the borrowers on the Feller Loans to Feller, and then helping her shepherd those

1   loans through the Westsound loan approval process.   Kravchenko advertised in Ukrainian

2   language newspapers about his ability to get loans.

3       100.    A number of the Feller borrowers believed that Kravchenko worked for

4   Westsound.  Upon information and belief, borrowers would call the branch, ask for him, and be

5   connected to him at the desk he was allowed to maintain at the Federal Way branch of

6   Westsound.  Kravchenko translated for those borrowers, many of who could not speak English

7   well.  If Feller met with a prospective borrower, Kravchenko sat in on the interviews.  In a

8   number of instances, Kravchenko would tie up properties, find a straw buyer to obtain the loan

9   to buy property and fund construction to build a spec home.

10      101.    In return, Kravchenko, through his construction companies Artisan Homes,

11  Pallazzo Homes and Urban Homes, received a "Development Fee," on many of the Feller Loss

12  Loans usually in the amount of $10,000 to $15,000, which fee was either paid out of the loan

13  proceeds or in an early draw.  No work was performed for these fees, and many borrowers on

14  the Feller Loans knew nothing of the fees.  Kravchenko's wife, Galina, was a real estate agent

15  with Skyline Properties and obtained commissions on numerous real estate sales arranged by

16  her husband.

17      102.    Pursuant to the terms of the Bank's Loan Policy, due to their size, all 20 of the

18  Feller Loans should have been presented to and approved by the DLC.  Only the loan to

19  Nikolay Kozlov, however, was approved by the DLC, including Defendants Green, Johnson,

20  Reynolds, Weir and Westfall, on April 4, 2007.

21      103.    As Board members and/or executive officers of the Bank, the Defendants

22  received monthly Loan Income Reports which indicated the size of the Feller loans, along with

23  the commission amount for each loan.  Having access to these reports, the Defendants knew or

24  should have known the Feller Loss Loans were not being approved by the DLC.

25      104.    These commission reports also indicated that extremely large construction loans

26  were being originated by the same loan officer (Feller) who was routinely receiving the highest

27  or second highest incentive-based compensation each month.  They knew or should have

28  known that commissions on the Feller Loss Loans were being made in violation of FDIC Rules

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 22
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1    and Regulations, prescribed by 12 U.S.C. § 1831 p-1, including Part 364, Appendix A,

2    Section III.

3        105.    The following Feller Loss Loans are illustrative of the problems with these

4    loans.

5        **A. Vladimir Grib**

6        106.    On May 24, 2007, Vladimir Grib, a 31-year-old Russian immigrant who worked

7    as a registered nurse and general contractor, obtained a $1,240,000 loan from Westsound Bank

8    for construction on property in Auburn, Washington. Feller was the loan officer. This property

9    was first sold to Kravchenko's company, Artisan Custom Homes, on April 4, 2007, which in

10    turn sold the property to Grib via Amendment to the Purchase and Sale Agreement on April 23,

11    2007. "Galina K" of Skyline Properties was the real estate agent on this transaction, and

12    Skyline Properties received $55,000 in commission for the sale. Grib put no money down on

13    the property. At closing, a disbursement out of the loan proceeds of $15,000 was made to the

14    Kravchenkos' Pallazzo Homes.

15        107.    The loan file contains two Uniform Residential Loan Applications, including

16    one with signatures that postdate the closing. The first application, signed and dated April 26,

17    2007, sought a 12-month loan for $1,240,000 at 7.25% interest. The purpose of the loan was

18    documented as a refinance of a primary residence, though in reality it was for new construction.

19        108.    The loan was approved on May 23, 2007 as a refinance of a primary residence.

20    The second loan application signed and dated June 8, 2007, more than two weeks after the date

21    of the note, sought the same amount, term and rate. The purpose of the loan, however, was

22    changed to a "purchase." Unlike the first application, which stated a high net worth for the

23    borrower, the second application indicated a negative net worth.

24        109.    In connection with the loan approval, the property was appraised as of April 27,

25    2007 by Harbour Pointe Appraisal. The valuation by cost approach resulted in a value that was

26    hundreds of thousands of dollars more than the amount of the loan from Westsound Bank,

27    which loan was to cover both costs of the property and construction to completion. The as-

28    built appraised value was subject to completion per plans and specifications for a home with 11

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 23
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

rooms, 5 bedrooms, 5.5 baths and 7,179 square feet of gross living area.  The appraisal review listed the house as being a non-owner occupied home, and noted the absence of the required income approach valuation.  The appraisal was nonetheless approved on May 24, 2007.   The next appraisal was performed as of March 5, 2008.  The cost approach valuation increased significantly from the prior valuation.  The home was listed as consisting of 12 rooms, 4 bedrooms, 5.5 baths and 6,650 square feet of gross living area above grade.  The appraisal was approved March 12, 2008.

110.    There are two versions of the borrowers' 2005 and 2006 Income Tax Returns in the file.  The unsigned versions of each suggest adjusted gross income of roughly $50,000 more than the signed versions.  The Grib loan went into default.

**B.  Nikolay Kozlov**

111.    In 2006, Kravchenko approached Nikolay Kozlov, a 39-year-old Russian immigrant who was self-employed as a stucco contractor, and offered to help him obtain a loan.  Upon information and belief, Kravchenko told Kozlov he was working for Westsound Bank, and introduced Kozlov to Feller.

112.    In August 2006, Kozlov received a residential construction loan in the amount of $1,000,000 on property in Auburn, Washington.  In April 2007, Kozlov received a second loan in the amount of $1,183,000 for construction of property at Auburn, Washington.  Feller was again the loan officer.   The loan memorandum stated that the loan type was for spec construction, and the loan was approved unanimously by the DLC on April 4, 2007, including Green, Johnson, Reynolds, Weir and Westfall.  The memorandum noted that the home would be marketed for approximately $1,600,000.  Kozlov's application for the second loan, dated March 5, 2007, sought $1,190,000 for a refinance of *another* primary residence.  Housing expenses were proposed to increase nearly 230%.  However, the final figure for monthly housing expenses did not reflect the 295% increase in housing expenses already stated in connection with his first loan with Feller at WSB.

113.    Kozlov put no money down to purchase either of his lots.  On the second property, Galina Kravchenko collected $55,000 in commission as a real estate agent with

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 24
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1  Skyline Properties.  Kozlov's HUD Statement shows a $15,000 Development Fee was paid to
2  an unidentified company.  Upon information and belief, this Development Fee was paid to a
3  Kravchenko entity.

4       114.  The original appraisal was performed by Sterling Appraisal Group as of
5  March 7, 2007, and valued the property on the basis of plans having 13 rooms, 4 bedrooms, 3.5
6  baths and 7,184 square feet of gross living area.  A second appraisal conducted by Discovery
7  Appraisal, LLC as of March 28, 2008, had the same as built valuation, but the house plans were
8  quite different: the appraisal discussed 11 rooms, 4 bedrooms, 4.5 baths and only 5,638 square
9  feet of living space.  Kozlov submitted no design plans to the Bank.

10       115.  A Problem Asset Status Report filed on the Kozlov loans as of May 9, 2008
11  gave Kozlov a loan grade of 5 because delays in permitting caused delays in construction.  In
12  addition, due to market conditions and findings of suspect documentation from the origination
13  of the loan, the loans were classified for special attention.

14       116.  Both of Kozlov's loans went into foreclosure.

15       **C.  Svyatoslav Cherevach**

16       117.  In June 2007, Svyatolsav Cherevach, a 34-year-old Russian immigrant who was
17  self-employed, obtained a $1,905,000 home construction loan from Westsound Bank.  Feller
18  was the loan officer.  There are two loan applications in the Bank's files.  The first loan
19  application was signed and dated June 13, 2007, and the second application signed and dated
20  on July 26, 2007, three weeks after the loan was approved.  There are significant differences
21  between the first and second loan applications prepared by Feller: the original application states
22  the purpose of the loan is for refinance, while the second application states that the loan is for
23  purchase.  Cherevach's stated monthly income also increased in the second application.
24  Proposed monthly housing expenses on both applications stated a 692% increase.  Cherevach's
25  stated net worth decreased nearly 75%.  Cherevach's tax returns are all unsigned and undated.

26       118.  The automated underwriting decision is dated July 2, 2007, based on stated
27  monthly income and an LTV of 70.56%.  The Loan Approval was signed on July 5, 2007,
28  using a full/alt document type for a refinance loan.  Settlement statements show that $31,500 in

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 25
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1    real estate commissions was paid out of the loan proceeds to Skyline Properties.  A $15,000

2    Development Fee to Kravchenko's Pallazzo Homes was also listed on several of the HUD

3    Statements, as well as the signed Itemization of Amount Financed dated July 26, 2007.

4         119.    The loan file contains agreements dated June 15-16, 2007 which indicate that

5    Kravchenko's company Artisan Homes was to build the home.    Those agreements

6    contemplated a 6,600 square foot home.  An appraisal of the subject property was conducted by

7    Harbour Pointe Appraisal as of June 26, 2007.  The appraisal, subject to completion per plans

8    and specifications, contemplated a home listed as 11 rooms, 5 bedrooms, 5.5 baths and 7,179

9    square feet of gross living area above grade.  This appraisal was approved on July 6, 2007.  The

10   property was next appraised by Alan L. Pope & Associates, Inc. as of June 10, 2008.  The Pope

11   appraisal, which was also subject to completion per plans and specifications, stated that the

12   home was 80% complete, with 12 rooms, 4 bedrooms, 4 baths and only 4,572 square feet of

13   gross living area, a decline of 2,607 square feet of living space.  The April 22, 2009 appraisal

14   by Clearpoint Appraisal, Inc. stated the home had 11 rooms, 5 bedrooms, 3.75 baths and 4,619

15   square feet of gross living area.    The valuation was considerably lower than previous

16   appraisals; part of the stated reason for the lower valuation was that the subject home was

17   larger and of higher quality than nearly everything in the surrounding area.

18        120.    A WSB Problem Asset Status Report dated July 20, 2008, stated that the

19   property was most likely a home being built speculatively for sale.  The home was ultimately

20   completed but foreclosed upon in early 2009.  A short sale occurred in March of 2009, resulting

21   in a charge-off of $1,103,500.30.

22                        **D.  Vitaliy Voytovich**

23        121.    In 2007, Vitaliy Voytovich became a customer of Westsound Bank when he

24   obtained a $1,770,000 loan for purchase of property and construction of a home in Bellevue,

25   Washington.  Voytovich, a 26-year-old Russian immigrant at the time he applied for his loan,

26   was self-employed as a painting contractor.

27        122.    Upon information and belief, Voytovich first met Kravchenko when Voytovich

28   went to Westsound Bank to inquire about obtaining a loan and Kravchenko was in the branch.

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 26
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Voytovich was under the impression that Kravchenko was a loan officer at the bank. Voytovich met Feller at the same time. Kravchenko translated for Voytovich during the loan application process.

123. Upon information and belief, after their first meeting, Kravchenko and Feller asked Voytovich to return with financial information, and he brought such information to their next meeting. Voytovich was still looking for a lot to purchase, but Kravchenko suggested a property to him after their first meeting. The lot was larger than Voytovich had originally intended on purchasing, but he decided to buy it anyway. In actuality, Kravchenko, through Artisan Homes, had already executed a Purchase and Sale Agreement on the property. Upon information and belief, the Purchase and Sale Agreement was then assigned to Voytovich. Galina Kravchenko served as Voytovich's real estate broker, and she earned a $25,500 commission on the sale.

124. There are two loan applications in Voytovich's file, though only the second bears Voytovich's signature. The second is dated July 12, 2007, the date of the note, and a day after the loan was approved. While the original unsigned application, purportedly mailed on June 14, 2007, states the purpose of the loan is for refinance, the final application switches that purpose to purchase. The combined monthly housing expense increase was 736%. Voytovich's stated net worth decreased roughly 82% from the original application to the final application.

125. Upon information and belief, Voytovich submitted tax returns to the bank upon request, but does not believe that the 2005 tax return in his loan file is the same document he submitted. It appears to state much more income than Voytovich actually made in 2005. There are two versions of 2006 tax returns in Voytovich's file; there is a 91.5% difference between the adjusted gross income amount stated in the unsigned copy and the signed copy.

126. The loan was approved on July 11, 2007, as a refinance under a "full/alt doc" type program. The Loan Approval form did not indicate that certain listed conditions for the loan had been met, though final approval was granted. The automated underwriting decision

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 27
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

was run on July 5, 2007 for a loan of $1,500,000, and listed as an acceptance, based upon stated monthly income and an LTV of 65.56%.

127.    Upon information and belief, Kravchenko did not explain to Voytovich that he would charge a Development Fee in connection with Voytovich's loan.    A $15,000 Development Fee is listed on a Contractors Breakdown and Job Progress Draw Request Form.

128.    Voytovich never submitted any building plans to the bank.    Nonetheless, the June 26, 2007 appraisal by Harbour Pointe Appraisals provided a valuation of the property and home subject to completion per plans and specifications, for a home that was 11 rooms, 5 bedrooms, 5.5 baths, and 7,179 square feet of living area.    The appraisal review listed the loan as a non-owner occupied property, which requires an income approach that is not included in the Harbour Pointe appraisal, but the appraisal was nonetheless approved on July 11, 2007. The second appraisal was by Ron Cowan Appraisal Service Inc. as of March 30, 2008.    The Cowan appraisal, also subject to completion per plans and specifications, listed a home with 11 rooms, 4 bedrooms, 4.5 baths and only 5,794 square feet of living area, a large decline in living space from the Bunn appraisal.

129.    Voytovich began construction on his home, but did not complete it.    The loan went into default.

130.    The losses on the Feller Loss Loans are ongoing, as loan amounts continue to be charged off.    Thus, the total amount of losses, including on these loans highlighted by way of example, continues to increase.

131.    All of the Feller Loss Loans, along with an alarming number of the 120 Feller Loans, did not pay off at maturity and went into default.    Westsound incurred additional damages in the form of attorney's fees for counsel retained to proceed with foreclosure actions, other collection efforts and/or defense of lender liability claims.    One firm, Ryan Swanson & Cleveland PLLC, was consulted and/or retained by Westsound in connection with 65 delinquent lending relationships, including collection efforts involving at least 15 Feller Loans, four of which were Feller Loss Loans, as well as one of the DLC Loans (Ginger Perkins), and loans to Defendant Green and Feller.    Ryan Swanson also represented Westsound in connection

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

with lender liability claims brought against the Bank by Nikolay Kozlov, who received two Feller Loans in the total amount of $2,183,000.

132.    The FDIC, as Receiver for Westsound, has suffered a principal loss in connection with these loans in an amount to be determined at trial, but not less than $10 million.

133.    Moreover, as a result of the Defendants' failure to properly design and/or supervise the Loan Originator Compensation Policy, the FDIC as Receiver for Westsound has suffered damages in the amount of commissions paid on each Feller Loan made in violation of the Loan Policy.

**III.    The DLC was Negligent, Grossly Negligent and Breached its Duties in Approving Seven ADC and CRE Loss Loans**

134.    At relevant times, Defendants Johnson, Green, Weir, Reynolds, Parr and Westfall were all members of the DLC (the "DLC Defendants").   Defendant Johnson sat on the DLC by virtue of his position as President and CEO of Westsound, and Defendant Green sat on the DLC by virtue of his role as EVP of Sales and Lending.  By serving on the DLC, Defendants Weir, Reynolds, Parr and Westfall took on an active "de facto" officer role rather than a supervisory role.   The DLC Defendants voted to approve some combination of the following seven high-end residential land development and CRE loans:

| Borrower | Loan Date | Loan Amount | DLC Approval |
|---|---|---|---|
| Kravchenko | 5/31/06 | $1,134,000 | Reynolds, Westfall, Weir, Johnson (May 16, 2006) |
| Perkins | 7/8/06 | $1,469,000 | Reynolds, Weir, Parr, Green (June 27, 2006) |
| Shramovych | 7/12/06 | $1,100,000 | Reynolds, Parr, Weir, Johnson, Green (June 27, 2006) |

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 29
#843283 v1 / 44469-002

*Law Offices*
K ARR  T UTTLE  C AMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

| Borrower | Loan Date | Loan Amount | DLC Approval |
|---|---|---|---|
| Winslow Holdings LLC | 7/13/06 | $5,500,000 | Reynolds, Parr, Weir, Johnson (June 27, 2006) |
| Brian Cunningham | 11/30/06 | $2,051,272 | Reynolds, Westfall, Weir (October 31, 2006) |
| Trueline Construction | 12/29/06 | $625,000 | Reynolds, Westfall, Weir (October 31, 2006) |
| JOH LLC | 6/06/07 | $1,618,055 | Reynolds, Westfall, Green (May 30, 2007) |

135.    All of these loans were poorly underwritten and were not financially viable.  The information provided to the DLC Defendants prior to the committee voting demonstrated that these loans did not comply with the Bank's Loan Policy.  Particularly, there was little or no borrower equity or verification of the borrowers' ability to repay, the loan applications included facially inaccurate or inconsistent information, appraisals were insufficient or inaccurate, relying on "as stabilized" or "as completed" valuations, and the loan files contained inadequate financial analyses of the projects.  The DLC violated FDIC Rules and Regulations by failing to disclose to the Board loans that exceeded the Bank's LTV limits.

136.    Each and every Defendant on the DLC was on notice of the problems surrounding these ADC and CRE loans due to the regulatory criticisms contained in the 2006 and February 2007 RoEs presented to the Defendants.

137.    The DLC Defendants knew or should have known that commissions would be paid on these loans through the Bank's loan originator compensation policy in violation of the FDIC rules and regulations, prescribed by 12 U.S.C. § 1831 p-1, including Part 364, Appendix A, Section III.

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 30
#843283 v1 / 44469-002

138.     Moreover, in light of the warnings by examiners in the February 2006 and 2007 RoEs regarding the Bank's risky construction lending practices, defective underwriting and credit administration, and deficient risk management, the non-DLC members of the Board were not entitled to rely upon the DLC for review and approval of these loans, and those Defendants recklessly failed to investigate the issues surrounding such loans.

### A.     Perkins Loan

139.     On June 27, 2006, DLC members Reynolds, Weir, Parr, and Green approved a $1,469,000 loan to Ginger Perkins ("Perkins"), a grocery store clerk.  Johnson had opposed the loan.

140.     The stated purpose of the loan was to purchase three duplexes and convert them to single-family residences for sale.  The loan memorandum stated that: "Borrower is betting on the market continuing to increase over the next year."

141.     Perkins, whose salary and assets were not commensurate with the size of the loan granted to her, was not required to put any significant equity into the deal.  Granting such a large loan to someone with little income violated the Bank's Loan Policy and was the subject of regulatory criticism in the February 2006 RoE.

142.     The property was appraised "subject to completion" at $1,665,000, resulting in an 88 percent LTV ratio.  Appraisers made no income basis calculation.  While second and third lien positions on other properties were provided as additional collateral, these were never appraised by the Bank and turned out to be worthless.  These junior liens were ultimately released by the Bank for $8,000.

143.     The joint October 2007 RoE cited the Perkins loan as an example of the DLC's particularly poor credit judgment.  The examiners noted that the DLC failed to act like prudent business persons, as Perkins had little to no experience with this kind of project.  Perkins had fired two general contractors over disagreements on how to proceed, and abandoned her original plan to convert the duplexes to single-family residences for sale in favor of remodeling and leasing the duplexes "as is."  This was problematic because the valuation of the project was

1  based on three completed single-family residences, and it was unclear whether lease or sale of

2  duplex units could sufficiently service the debt.

3             **B.**    **Winslow Holdings LLC Loan**

4        144.    A $5.5-million loan to Winslow Holdings LLC ("Winslow Holdings") was

5  approved on June 27, 2006, by Defendants Reynolds, Parr, Weir and Johnson.  Approval was

6  granted despite the credit memo provided to DLC stating that the "project appears marginal

7  because the borrowers are absorbing the cost of all 3 parcels of land on subject loan, even

8  though subject property only encompasses the back 2 parcels."

9        145.    As of December 31, 2005, the Winslow Holdings borrower had negative net

10  worth, and the liquid net worth of guarantors was collectively estimated at just $250,000 based

11  on the data provided to Westsound, which was from 2004.

12        146.    Directors approved the loan, despite the fact that the borrowed amount would

13  not be sufficient to complete the project because $2.1 million of the loan was slated to pay off a

14  loan to another bank.

15        147.    The "as is" assessed value of the property was only $994,650, and there was no

16  income valuation for the secondary replacement source listed as future rental income.

17             **C.**    **Cunningham Loan**

18        148.    On October 31, 2006, a $2,051,272 loan to Brian Cunningham ("Cunningham")

19  was approved by Defendants Reynolds, Westfall and Weir.

20        149.    Cunningham's low borrower equity in the project was criticized in the February

21  2006 RoE as an exception to the Loan Policy, which required a minimum cash equity for

22  construction lending of 11% of the total costs of a project.

23        150.    The collateral for the loan was a 1st Deed of Trust on a property located at 61

24  Bella Bella.  However, in January 2005, a Loan Information Sheet had been signed by the DLC

25  for an earlier loan which also had a 1st Deed of Trust on 61 Bella Bella. There is no indication

26  in the loan file that the DLC Defendants put any effort into investigating this issue.

27        151.    The subject property appraisal was unrealistic.  According to a later Bank

28  admission, it "was originally thought that [it] . . . was valued high."  The updated appraisal

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 32
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1   resulted in an overall 98% LTV, which was criticized in the February 2006 RoE.  Further, the

2   LTV ratio used in approving the loan, and which was admittedly facially suspect, was based

3   solely "on completion" value.  No valuation of the property "as is" or on an income basis, as

4   required for speculative construction, was provided.

5           **D.**     **JOH, LLC**

6        152.    On May 30, 2007, a construction loan to JOH, LLC in the amount of $1,618,055

7   was approved by Defendants Reynolds, Westfall, and Green.  The purpose of the loan was to

8   complete the outside and 3rd floor of a commercial building.

9        153.    Three weeks earlier, on May 9, 2007, the DLC had unanimously denied a loan

10  request to JOH, LLC for a $1,850,000 loan at a rate of WSJ Prime plus 0.50% for construction

11  of a commercial building.

12       154.    In the May 30, 2007 credit memo, the loan officer showed awareness that the

13  loan was highly speculative, stating that "JOH LLC is not an income producing entity.  The

14  LLC was formed for the sole purpose of constructing the subject property located off of 10th St.

15  in Poulsbo."

16       155.    There was insufficient borrower equity on the loan, an exception to the Loan

17  Policy.  Further, there was inadequate analysis of the debt coverage ratio.

18       156.    An existing $1,000,000 Westsound loan had been granted in 2005 to a company

19  related to JOH, LLC for construction of the same building.  The additional funds were needed

20  in part because the previous loan officer had allowed $142,000 of loan funds to be advanced at

21  closing that should have been paid by borrower.  The project was also delayed for over a year

22  due to major permit problems.  The DLC failed to analyze whether this was a project worthy of

23  additional funding.

24          **E.**    **DLC-Approved Feller Loans**

25       157.    Several of the Feller Loans, including the Kravchenko loan, the Shramovych

26  loan, and the Trueline Construction loan, were approved by the DLC in 2006 and 2007.  The

27  Trueline Construction loan was approved on October 31, 2006, by Defendants Reynolds,

28  Westfall and Weir.  The Shramovych loan was approved on June 27, 2006, by Defendants

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 33
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Reynolds, Parr, Weir, Johnson, and Green.  The $1.134 million Kravchenko loan was approved on May 16, 2006, by Defendants Reynolds, Westfall, Weir and Johnson, over the opposition of Parr.  In addition, the $1,183,000 Kozlov loan referenced at Paragraph 78 was approved by Defendants Green, Johnson, Reynolds, Weir and Westfall on April 4, 2007.

158.    These approvals came after the criticisms provided to the Board in connection with the February 2006 FDIC examination, including criticisms related to high concentrations in CRE/ADC lending, high LTV ratios and the risk of making loans with little or no borrower equity.

159.    Prior to approval, the DLC was presented with information on each of these three loans that reflected no borrower equity, loan applications which did not state the same purpose of the loan as described in the loan memorandum (*e.g.*, primary residence versus speculative home refinance versus construction), and documentation that raised the issue of straw buyers being put forward to serve as borrowers when they had no ability to pay back the loan nor intention of living in the homes being constructed.

160.    Notwithstanding the foregoing, each of these loans was approved by the DLC with little or no discussion and no notation explaining Loan Policy exceptions or the grounds for approval, all in violation of prudent underwriting principles.

161.    None of these loans performed as required.  The losses on these loans are ongoing, as loan amounts continue to be charged off.  Thus, the total amount of losses, including on these loans highlighted by way of example, continues to increase.  As a result, the FDIC as Receiver of Westsound is expected to suffer loss on these loans in an amount to be determined at trial, but not less than $3.8 million.

### IV.    The Board Allowed Preferential Insider Lending in Violation of Laws and Regulations

162.    Numerous Insider Loans were made in violation of both the Bank's Loan Policy and 12 U.S.C. § 375b and corresponding FDIC rules and regulations governing insider transactions, including Regulation O, because they were not approved by the Board in advance

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 34
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1   of disbursement and because they were made on preferential terms and rates, and/or bore more

2   than the normal risk of repayment.

3       163.    These Insider Loans include the following seven loans:

| Date | Borrower | Insiders | Loan Amount | DLC Approvers |
|---|---|---|---|---|
| 5/31/06 | Brian McLellan, Heath McLellan, Valerie Spaulding | McLellan | $332,000 | Johnson, Reynolds, Westfall, Parr, Green (April 11, 2006) |
| 6/27/06 | Samson's Rentals | Christopherson | $236,959 | Johnson Parr, Reynolds, Weir (June 27, 2006) |
| 11/22/06 | Deelori Enterprises | Weir | $411,000 | Johnson, Reynolds, Westfall (November 22, 2006) |
| 5/22/07 | Dean Reynolds | Reynolds | $233,055 | Approved 1 year earlier by Johnson, Green, Weir, Westfall, Parr (March 14, 2006); Ratified by Board July 17, 2007 |
| 5/22/07 | TTIC, LLC | Reynolds | $1,250,000 | Johnson, Green, Reynolds, Weir, Westfall (May 21, 2007); Ratified by Board July 17, 2007 |
| 6/27/07 | Weir Green LLP | Weir, Green | $500,000 | Reynolds, Westfall (June 27, 2007); Ratified by Board July 17, 2007 |
| 9/5/07 | Samson's Rentals | Christopherson | $205,000 | Reynolds, Westfall, Johnson (September 5, 2007) |

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

164.   At all relevant times, board approval prior to funding of the Insider Loans was required under Regulation O, if the loan amount to the insider and related entities exceeded $25,000 or five percent of the Bank's unimpaired capital and surplus, whichever was higher, or if the aggregate loan line amount to the insider was greater than $500,000.

165.   Each of the Insider Loans noted above either exceeded $500,000 and/or, due to other outstanding loans, was part of a lending relationship at the Bank that exceeded $500,000 and thus required Board pre-approval under Regulation O.

166.   All the Defendants were either officers or directors of a financial institution insured by the Federal Deposit Insurance Corporation.  As such, each was required to understand the legal requirements surrounding insider transactions.  None of the Insider Loss Loans were approved in advance of funding by the Board.

167.   While the Board attempted to ratify three of the loans after funding, this does not constitute prior approval on the merits.  Moreover, these ratifications occurred without any review of the insider borrowers' financial statements or any analysis of ability to repay the loan.

168.   In further violation of law, all seven of these Insider Loans were made at preferential interest rates and terms not offered to non-insiders.  Defendants allowed insider loans to be made on "Directors terms and conditions."  In 2006, those terms and conditions typically provided for interest of a base rate minus 2.25 percent.  This "director rate" was preferential because it was the lowest offered by the Bank and was not available to any non-insider borrower for any loan type, and it was given to directors regardless of the type of loan (*e.g.*, loans secured by heavy equipment or real estate, unsecured lines of credit).  In 2007, the terms offered to Directors were not always uniform but nonetheless reflected preferential terms as compared to those offered to non-insiders.

169.   The Insider Loans also bore more than a normal risk of repayment.   A number of the loans had terms that were exceptions to the Loan Policy, and the loan write-ups recommending approval did not follow the underwriting procedures used for other loans, as the loan officers performing the credit analyses were not permitted to review and analyze the

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

borrower director's financial information.  For example, the Loan Memoranda recommending approval of the two insider loans to Samson's Rentals (a closely held interest of Christopherson) identified Christopherson as a guarantor but did not analyze Christopherson's financial condition.  Instead, the memoranda stated:  "Dick Christopherson is a Director of Westsound Bank, and all financial information is held by the President/CEO of Westsound Bank."  The DLC approved both loans unanimously.  The Board never approved or ratified either loan.

170.    Each of the Insider Loans noted above was approved by the DLC despite the fact that the loans were to be made on preferential interest rates and terms not offered to non-insiders in violation of Regulation O.

171.    In allowing preferential rates and terms for insiders and their related interests, the Defendants acted in their own self-interest at the expense of the Bank.  Upon information and belief, all Defendants were offered access to loans at director rates and terms; most, if not all, borrowed money from Westsound.

172.    Defendants Johnson, Reynolds, Westfall, Parr, Green, and Weir each voted to approve two or more (*see* chart at Paragraph 163) of the insider loans at the DLC level despite knowing that these loans were in violation of 12 U.S.C. § 375b and corresponding FDIC rules and regulations, including Regulation O.

173.    Defendants Johnson, Reynolds, Westfall, Parr, Green, and Weir also knew or should have known that these loans were being approved at the DLC level in violation of the law.

174.    Each and every Defendant knew or should have known that the Insider Loans were being made without prior Board approval in violation of the law, as each received monthly reports identifying the loans of each officer and director, few of which had been approved by the Board.  All of the Defendants also knew that Insider Loans were being given the "Director" rate and "Director" terms and conditions, no matter what the type of loan or risk presented, in further violation of the law.  The following Insider Loans are illustrative of the Defendants' preferential lending scheme:

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 37
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

## A.  Brian McLellan

175.    On April 11, 2006, Defendant McLellan was granted a $332,000 loan by the DLC, including Reynolds, Westfall, Parr, Green, and Johnson.  The loan purpose was for a condominium investment purchase.  With the addition of this loan, McLellan's outstanding loan obligations to the Bank would exceed $500,000.  As such, the Board was required to approve the loan; it failed to do so.  The loan was for a 12-month term at a rate of WSJ Prime minus 2.25%.  Loan to Cost was 100%, and it was noted that McLellan would provide a financial statement to David Johnson at a later date; the loan was thus approved without current financials.

## B.  Samson's Rentals Loans

176.    On June 27, 2006, the DLC, including Johnson, Parr, Reynolds and Weir, granted a $236,959.40 loan to Christopherson's company Samson's Rentals, an industrial equipment rental company.  The purpose of the loan was the purchase of a truck and trailer. LTV was 100%.  The loan term was five years, at a rate of Base minus 2.25%.  There was no personal financial review at the DLC level, due to Christopherson's status as a director of the Bank.  Christopherson's outstanding total loan balance was well in excess of the $500,000 limit requiring Board approval; however, the Board did not approve the loan.  The February 2007 RoE listed the lending relationship as a Special Mention due to lack of verifiable repayment capacity or valid collateral.  The RoE criticized the stale financials as being insufficient and providing little support for the loan, and considered the company (which served as the primary asset) to be significantly overvalued.

177.    On September 5, 2007, the DLC, including Westfall, Johnson, and Reynolds, approved a seven-year, $205,000 loan to Samson's Rentals for financing covering the purchase of machinery at a rate of WSJ Prime plus 0%.  LTV was 100%, which was listed as a policy exception and a weakness of the loan.  Again, despite a total loan balance in excess of $500,000, the Board failed to approve the loan.  Financials were "sealed" on the grounds that Christopherson was a director.

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 38
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**C.  Deelori Enterprises**

178.    On November 22, 2006, a $411,000 loan was granted to Deelori Enterprises, a Weir-related partnership used for real estate investments, by DLC members Johnson, Reynolds, and Westfall.  The loan, which was to provide repayment of loans to the principals, including Defendant Weir, was for a 10-year term at Base minus 2.25%, with equal monthly payments of $2,840 and a balloon at maturity.  Weir's total lending relationship was well in excess of the $500,000 threshold for Board approval; the Board, however, did not approve the loan.  Neither guarantors', including Weir's, personal financial information was presented to the DLC due to Weir's status as Chairman of the Board of Directors.

**D.  Dean Reynolds**

179.    On March 14, 2006, Defendants Parr, Westfall, Weir, Johnson and Green approved a $233,055 loan to Defendant Reynolds for the purpose of purchasing a single-family residence for "residential and commercial rental."    At the time, there were outstanding Reynolds-related borrowings which would have brought the total lending relationship above the $500,000 limit.  As a result, this loan should have been approved by the Board, but was not. The interest rate was the preferential "directors' rate" of Base minus 2.25%.  There was no appraisal on the property.  Rather, the loan officer accepted an owner estimated value ("OEV"). There was no analysis of the borrower's financial condition, as the loan officer was not allowed to review Defendant Reynolds' financial information.  Despite this fact, "personal income" was listed as the secondary repayment source.  The primary repayment source was listed as "rental income" but there was no detail indicating that borrower had lined up a rental deal or any detail as to the expected amount of any rental income.  The cost to value ("CTV") was 90%.  The borrower equity was minimal, noted as a weakness to the proposed loan.  The loan was funded a year later; Westsound was later criticized by examiners for not approving loans closer to funding.

**E.  TTIC, LLC**

180.    On May 21, 2007, Defendants Johnson, Green, Weir and Westfall approved at the DLC level a loan to TTIC, LLC ("TTIC") in the amount of $1,250,000.  Reynolds owned

100% of TTIC, a company which specialized in metal coatings.  The loan was for three years at a rate of WSJ Prime minus 1%, for the purpose of funding equipment, tenant improvements and a new location.  Reynolds' total lending relationship was well in excess of the $500,000 threshold for Board approval; the Board, however, did not approve the loan; it was not until after the loan was granted that the Board ratified the loan after the fact, on July 17, 2007.  Reynolds' financial information was withheld from the DLC due to his status as a director.  The collateral was identified in the Loan Memorandum as inadequate, and policy exceptions for a 218% LTV and term were noted.  Moreover, the borrower had not demonstrated an ability to repay.  A previous loan to TTIC was repaid at maturity through the proceeds of this loan.  The loan was approved regardless.

### F.  Weir Green LLP

181.  On June 27, 2007, Weir Green LLP ("Weir Green") was granted a $500,000 loan by the DLC, including Reynolds and Westfall.  Weir Green is a real estate investment vehicle of Weir and Green.  The loan was to assist in the purchase of a 50% undivided interest in Olympic Development, LLC, another investment company half owned by Weir and Green.  The loan was for 90 days at WSJ Prime plus 0%.  There was no personal financial review, due to Weir and Green's status as a director and/or officers of the Bank.  The loan was unsecured, although there was a Second Deed of Trust on a property that was held in an "abundance of caution."  Although the loan reached the $500,000 Board approval threshold on its own, and the global lending relationship was well in excess of the threshold, the Board did not approve the loan.  It was not until after the loan was granted that the Board ratified the loan after the fact, on July 17, 2007.  At the time of this loan, there were a number of outstanding loans to Defendant Weir, Defendant Green and their related interests, all of which had been repeatedly extended, including another loan to Weir Green in the amount of $290,000 (approved May 24, 2005, at a rate of Base minus 2.25%, interest-only) which had already been extended over a year past its maturity.

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 40
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

182.     Each and every loan made to an insider or insider-related entity without prior Board approval where required and/or on preferential rates and conditions should not have been made.  The loans also bore more than the normal risk of repayment.

183.     Nonetheless, the Defendants allowed these loans to be made.  As a result, the FDIC as Receiver of Westsound has suffered loss on these loans in an amount to be determined at trial but not less than $1.7 million.

## COUNT I – BREACH OF FIDUCIARY DUTY
### (AGAINST ALL DEFENDANTS)

184.     Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 183 above as if fully set out in this Count.

185.     During all or part of the relevant times, Defendants Christopherson, Cox, Johnson, Lamb, McLellan, Parr, Reynolds, Weir, Westfall and Tucker were directors of Westsound.  Johnson and Green were also officers of Westsound.

186.     As directors and officers, Defendants owed a fiduciary duty to Westsound to act with the utmost care and in the best interests of the Bank in supervising management and/or other Bank employees in the design, implementation, and operation of lending policies to protect the Bank against excessive risk.  That, in turn, included but was not limited to a duty to ensure that management designed and implemented lending policies that complied with safe and sound lending practices.  These duties included, but were not limited:

    a.  To adopt such careful, reasonable and prudent policies and procedures, including those related to lending and underwriting, as required to ensure that the Bank did not engage in unsafe and unsound banking practices, and to ensure that the affairs of the Bank were conducted in accordance with these policies and procedures;

    b.  To communicate to the Bank's loan officers and underwriters a clear expectation that they must adhere to sound lending policies and credit underwriting by establish a system of checks and balances and by careful monitoring of loan officers' conduct;

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 41
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

c.  To require that sufficiently detailed, current and reliable information be provided upon which they could make prudent decisions, including the use of current technology and internal control procedures to timely identify problems and allow for early remediation;

d.  To support and foster Westsound's internal risk management functions, and ensure adequate funding for these functions for a bank of Westsound's size and assets;

e.  To develop contingency plans and take other proactive steps to limit or prevent significant financial losses in residential construction loan portfolio;

f.  To timely acknowledge and adequately respond to changes in economic conditions that create additional risk with respect to certain types of products or transactions;

g.  To enforce policies and procedures designed to ensure that loans would not be made based on inadequate or inaccurate information;

h.  Upon receiving notice of a possibly unsafe or unsound practice, to make a reasonable investigation thereof and to exercise reasonable business judgment with respect to all facts that a reasonable investigation would have disclosed;

i.  To carefully review reports of examinations and other directives of regulatory agencies, to carry out the instructions and orders contained in those reports, to investigate and cure problems noted therein, and to prevent any repetition of such problems and deficiencies;

j.  To ensure that the loans were administered in a safe and sound manner, that borrowers complied with all loan terms and conditions and that the Bank obtained and controlled its security interests in collateral securing loans;

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

k.  To conduct Westsound's business in compliance with all applicable state and federal laws and regulations.

l.  To inform themselves about proposed loans and the risks the loans pose to the Bank before they approved them;

m.  To ensure that loans which required approval pursuant to the Loan Policy were sent through the correct approval process;

n.  To properly supervise the lending function and lending program;

o.  To approve and/or ratify only those loans that conformed with the Loan Policy;

p.  To ensure that any loans they approved and/or ratified were underwritten in a safe and sound manner;

q.  To ensure that loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

r.  To establish sufficient reserves for loan losses and maintaining adequate capital consistent with the risk inherent in the lending policies;

s.  To ensure that the Bank had sufficient, capable personnel to undertake and administer the lending policies; and

t.  To ensure that any loans they approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

187.  Defendants breached their fiduciary duties by, among other things:

a.  Adopting and/or implementing unreasonable and imprudent lending and underwriting policies and procedures that amounted to unsafe and unsound banking practices with respect to loans in the Bank's portfolio;

b.  Causing the Bank to make residential, development and construction loans with little or no regard for borrowers' ability to repay them;

c.  Developing lending policies and procedures that improperly relied on the continued sustainability of increasing home prices;

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

d. Creating a loan portfolio with multiple layers of risk, without establishing adequate risk management limits and monitoring processes to account for those risks;

e. Failing to establish adequate limits on the Bank's concentration of ADC and CRE products, and failing to monitor and account for the consequent risks of negative amortization and payment shock to borrowers;

f. Failing to establish adequate limits on the Bank's concentration of products with high LTV ratios, and failing to monitor and account for the consequent risk of default;

g. Failing to ensure proper approval of the construction loans, including the Feller Loss Loans, despite regulatory criticism;

h. Failing to properly supervise the construction lending program, including the Feller Loss Loans, despite regulatory criticism;

i. Establishing employee compensation programs that encouraged high loan volume at the expense of loan quality instead of creating an atmosphere that encouraged sound lending practices and good credit procedures;

j. Encouraging stated income and stated asset lending despite the clear risks that this practice would lead to inaccurate or fraudulent loan applications and supporting documents;

k. Failing to ensure that an adequate risk management structure and risk contingency plans were in place for implementing the Bank's higher risk lending strategy;

l. Failing to develop adequate contingency or exit plans to meet changing market conditions;

m. Failing to inform themselves about the risk the Loss Loans and/or Insider Loans posed to the Bank before they approved or ratified certain of them;

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

n.  Approving certain of the Loss Loans and/or Insider Loans with terms that were inconsistent with the Bank's Loan Policy;

o.  Failing to ensure that the Loss Loans were underwritten in a safe and sound manner;

p.  Failing to ensure that the Loss Loans were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

q.  Failing to take all necessary actions to ensure that the Bank obtained and monitored its security interests in the collateral securing the Loss Loans;

r.  Failing to ensure that the Loss Loans did not violate applicable banking regulations or create unsafe and unsound concentrations of credit; and

s.  Failing to take action to prevent the reoccurrence of any unsafe or unsound banking practice that came to their attention, including, but not limited to, multiple and repeated warnings from WADFI and the FDIC about the various deficiencies noted above.

188.    As directors and officers, these Defendants owed fiduciary duties of due care and loyalty to Westsound to put the interests of the Bank and its depositors above their own interests at all times.

189.    Defendants breached their fiduciary duties by, among other things, failing to supervise management in the design, implementation, and operation of the lending policies to ensure that they met the appropriate standards, including those identified in Subparagraphs 186(a)-(t) above.

190.    The Defendants also breached their fiduciary duties, including the duty of loyalty, and engaged in wrongful self-dealing by failing to follow the laws and regulations, including Regulation O, related to the procedures for approval of the Insider Loans identified in the chart at Paragraph 163 above.

191.    The Defendants also breached both the duties of due care and loyalty by devising an insider loan program in which preferential rates and terms were offered to directors regardless of the type of loan or risk involved.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

192.    As a direct and proximate result of Defendants' breach of fiduciary duties, the FDIC, as Receiver for Westsound, suffered damages in an amount to be proven at trial.

**COUNT II – BREACH OF FIDUCIARY DUTY**
**(FOR LOSS LOANS AND INSIDER LOANS APPROVED BY THE DLC – AGAINST**
**DEFENDANTS JOHNSON, GREEN, WEIR, REYNOLDS, PARR AND WESTFALL)**

193.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 192 above as if fully set out in this Count.

194.    During all or part of the relevant times, Defendants Johnson, Weir, Reynolds, Parr and Westfall were directors of Westsound and on the DLC.  Johnson and Green were also officers of Westsound, and on the DLC.

195.    As members of the DLC, Defendants Johnson, Green, Weir, Reynolds, Parr and Westfall owed a fiduciary duty to Westsound to approve, modify and extend loans with the utmost care and in the best interests of the Bank.

196.    Defendants Johnson, Green, Weir, Reynolds, Parr and Westfall breached their fiduciary duties to the extent that they voted to approve, ratify or renew one or more of the Loss Loans or Insider Loans identified in the charts at Paragraphs 78, 134, and 163 above, by, among other things:

   a.   Causing the Bank to make residential, development and construction loans without proper analysis of borrowers' ability to repay them;

   b.   Failing to inform themselves about the risk the Loss Loans and/or Insider Loans posed to the Bank before they approved or ratified certain of them;

   c.   Approving certain of the Loss Loans and/or Insider Loans with terms inconsistent with the Bank's Loan Policy;

   d.   Approving Insider Loans on preferential rates or terms in violation of law and Regulation O;

   e.   Failing to ensure that the Loss Loans were underwritten in a safe and sound manner;

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 46
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

      f.    Failing to ensure that the Loss Loans were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

      g.   Failing to ensure that the Loss Loans did not violate applicable banking regulations or create unsafe and unsound concentrations of credit; and

      h.   Failing to take action to prevent the reoccurrence of any unsafe or unsound banking practice that came to their attention, including, but not limited to, multiple and repeated warnings from WADFI and the FDIC about the various deficiencies noted above.

197.    In addition, Defendants Johnson, Green, Weir, Reynolds, Parr and Westfall breached their fiduciary duty to the extent that they voted to approve, ratify or renew one or more of the loans identified in the charts at Paragraphs 78, 134, and 163 above, because they knew or should have known that each such loan involved one or more of the following characteristics, which increased the risk of default:

      a.    An excessive LTV ratio, as measured by applicable regulatory standards and Westsound's own Loan Policy;

      b.   A deficient or incomplete appraisal, or an appraisal that deemed the project unfeasible, despite warnings from examiners that Westsound must comply with minimum appraisal standards;

      c.   A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

      d.   Insufficient proof of pre-sales and/or necessary market demand; or

      e.   Insufficient collateral.

198.    Defendants Johnson, Green, Weir, Reynolds, Parr and Westfall also breached their fiduciary duties by voting to approve the Loss Loans and Insider Loans to the extent that they knew or should have known any of the foregoing conditions were present.

199.    As a direct and proximate result of these Defendants' breach of fiduciary duties, the FDIC, as Receiver for Westsound, suffered damages in an amount to be proven at trial.

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 47
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

## COUNT III – GROSS NEGLIGENCE UNDER 12 U.S.C. § 1821(k)
## (AGAINST ALL DEFENDANTS)

200.     Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 199 above as if fully set out in this Count.

201.     During all or part of the relevant times, Defendants Christopherson, Cox, Johnson, Lamb, McLellan, Parr, Reynolds, Weir, Westfall and Tucker were directors of Westsound.  Defendants Johnson and Green were officers of Westsound.

202.     Section 1821(k) of FIRREA holds directors and officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.

203.     As officers and/or directors, the Defendants owed Westsound a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances.

204.     Defendants were grossly negligent and acted with reckless disregard for or failed to exercise slight care by, among other things, the acts, errors, and omissions set for in Paragraphs 27-183 above.

205.     As a direct and proximate result of Defendants' gross negligence, the FDIC, as Receiver for Westsound, suffered damages in an amount to be proven at trial.

## COUNT III – NEGLIGENCE CLAIMS
## UNDER WASHINGTON LAW
## (AGAINST ALL DEFENDANTS)

206.     Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 205 above as if fully set out in this Count.

207.     During all or part of the relevant times, Defendants Christopherson, Cox, Green, Johnson, Lamb, McLellan, Parr, Reynolds, Weir, Westfall and Tucker were officers and/or directors of Westsound.

208.     As officers and/or directors, Defendants were required to discharge their duties in good faith, consistent with safe and sound lending practices, with the care an ordinarily

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 48
#843283 v1 / 44469-002

1   prudent person in a like position would exercise under similar circumstances and in a manner

2   the Defendant reasonably believes to be in the best interests of Westsound.

3   209.   Defendants breached their duties and were negligent by, among other things, the

4   acts, errors and omissions set forth in Paragraphs 27-183 above.

5   210.   In addition, Defendants breached their duties and were negligent by, *inter alia*,

6   failing to supervise management in the design, implementation, and operation of the lending

7   policies to ensure that they met appropriate standards.

8   211.   As a direct and proximate result of Defendants' negligence, the FDIC, as

9   Receiver for Westsound, suffered damages in an amount to be proven at trial.

10   **COUNT IV – GROSS NEGLIGENCE UNDER 12 U.S.C. § 1821(k)**
**(FOR LOSS LOANS AND INSIDER LOANS APPROVED BY THE DLC – AGAINST**

11   **DEFENDANTS JOHNSON, GREEN, WEIR, REYNOLDS, PARR AND WESTFALL)**

12   212.   Plaintiff re-alleges and incorporates by reference the allegations contained in

13   Paragraphs 1 through 211 above as if fully set out in this Count.

14   213.   During all or part of the relevant times, Defendants Johnson, Weir, Reynolds,

15   Parr and Westfall were directors of Westsound and on the DLC.  Johnson and Green were

16   officers of Westsound and on the DLC.

17   214.   Section 1821(k) of FIRREA holds directors and officers of financial institutions

18   personally liable for loss or damage to the institution caused by their "gross negligence," as

19   defined by applicable state law.  Gross negligence does not mean the "total absence of care,"

20   but it is "negligence substantially and appreciably greater than ordinary negligence."

21   215.   As DLC members, officers and/or directors, Johnson, Green, Weir, Reynolds,

22   Parr and Westfall owed Westsound a duty of care to carry out their responsibilities by

23   exercising the degree of care, skill and diligence that ordinarily prudent persons in like

24   positions would use under similar circumstances.

25   216.   Defendants were negligent by, among other things, their acts, errors, and

26   omissions set forth in Paragraphs 27-183 above.

27

28

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

217.    In addition, Defendants Johnson, Green, Weir, Reynolds, Parr and Westfall were grossly negligent by voting to approve or ratify one or more of the loans identified in the charts in Paragraphs 78, 134, and 163 above, because they knew each such loan involved one or more of the following characteristics, which increased the risk of default:

    a.    An excessive LTV ratio, as measured by applicable regulatory standards and Westsound's own Loan Policy;

    b.    A deficient or incomplete appraisal, or an appraisal that deemed the project unfeasible, despite warnings from examiners that Westsound must comply with minimum appraisal standards;

    c.    A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

    d.    Insufficient proof of pre-sales and/or necessary market demand; or

    e.    Insufficient collateral.

218.    As a direct and proximate result of these Defendants' gross negligence, the FDIC, as Receiver for Westsound, suffered damages in an amount to be proven at trial.

**COUNT V – NEGLIGENCE CLAIMS UNDER WASHINGTON LAW**
**(FOR LOSS LOANS AND INSIDER LOANS APPROVED BY THE DLC – AGAINST**
**DEFENDANTS JOHNSON, GREEN, WEIR, REYNOLDS, PARR AND WESTFALL)**

219.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 218 above as if fully set out in this Count.

220.    During all or part of the relevant times, Defendants Johnson, Weir, Reynolds, Parr and Westfall were directors of Westsound and on the DLC.  Johnson and Green were officers of Westsound and on the DLC.

221.    As DLC Members, officers and/or directors, Defendants Johnson, Green, Weir, Reynolds, Parr and Westfall owed Westsound a duty of care to conduct its business consistent with safe and sound lending practices, and to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances.  This duty of care, included, but was not limited to, the matters set forth in Subparagraphs 186(a)-(t) above.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

222.   As directors and officers, these Defendants owed fiduciary duties of due care and loyalty to Westsound to put the interests of the Bank and its depositors above their own at all times.

223.   Defendants Johnson, Green, Weir, Reynolds, Parr and Westfall breached their duties and were negligent by, among other things, the acts, errors and omissions set forth in Paragraphs 27-183 above.

224.   As a direct and proximate result of these Defendants' negligence, the FDIC, as Receiver for Westsound, suffered damages in an amount to be proven at trial.

### **REQUEST FOR RELIEF**

WHEREFORE, the Federal Deposit Insurance Corporation, as Receiver for Westsound Bank, demands a trial by jury and a judgment in its favor and against David K. Johnson, Brett T. Green, Louis J. Weir, Dean M. Reynolds, Rodney R. Parr, Larry C. Westfall, Richard N. Christopherson, Donald F. Cox, Jr., James H. Lamb, Brian B. McLellan, and Donald H. Tucker, as follows:

A.   An award of damages in an amount to be established at trial;

B.   An award of prejudgment interest on such damages;

C.   An award of costs and other expenses recoverable in connection with this proceeding; and

D.   Granting the FDIC such other and further relief as this Court may deem just, equitable or proper.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1  DATED this 12th day of April, 2012.

2                                      Respectfully submitted,

3                                      **FEDERAL DEPOSIT INSURANCE**
4                                      **CORPORATION, as Receiver for**
                                       **Westsound Bank**
5

6                                          s/ Walter E. Barton
                                       Walter E. Barton, WSBA #26408
7                                      Karr Tuttle Campbell
8                                      1201 Third Avenue, Suite 2900
                                       Seattle, Washington 98101
9                                      Telephone: (206) 223-1313
                                       Fax: (206) 682-7100
10                                     E-mail:  gbarton@karrtuttle.com

11                                     Kathleen M. Balderston,
12                                     NY Bar #2252534
                                       Kristin Jamberdino, NY Bar #4393005
13                                     Admitted Pro Hac Vice
14                                     Nixon Peabody LLP
                                       437 Madison Avenue
15                                     New York, New York 10022
                                       Telephone: (212) 940-3000
16                                     Fax: (212) 940-3111
17                                     Email: kbalderston@nixonpeabody.com
                                              kjamberdino@nixonpeabody.com
18

19                                     Gregory P. O'Hara, CA #131963
                                       Admitted Pro Hac Vice
20                                     Nixon Peabody LLP (CA)
                                       2 Palo Alto Square
21                                     3000 El Camino Real, Suite 500
                                       Palo Alto, California 94306
22                                     Telephone: (650) 320-7700
23                                     Fax: (650)320-7701

24                                     Attorneys for Plaintiffs

25

26

27

28

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 52
#843283 v1 / 44469-002

*Law Offices*
K A R R  T U T T L E  C A M P B E L L
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of April, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Mr. Curt Roy Hineline
Mr. Robert M. Crowley
Ms. Carolyn D. Robbs
Bracewell & Giuliani LLP
701 Fifth Avenue, Suite 6200
Seattle, WA  98104-7018

Counsel for Defendant Johnson

Mr. Henry Andrew Saller, Jr.
Mr. James A. Krueger
Ms. Lucy Russell Clifthorne
Vandeberg, Johnson & Gandara, LLP
1201 Pacific Avenue, Suite 1900
PO Box 1315
Tacoma, WA  98401-1315

Counsel for Defendant Parr

Mr. Jerry H. Kindinger
Mr. Roger J. Kindley
Mr. Bryan C. Graff
Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA  98101-3034

Counsel for Defendant Cox

Service was effected via email on:

Mr. Thomas Sterken
Keller Rohrback LLP
1201 Third Avenue, Suite 3200
Seattle, WA  98101
tsterken@KellerRohrback.com

Counsel for Defendants Weir, Reynolds, Westfall,
Christopherson, Lamb, McLellan and Tucker

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 53
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1   DATED this 12th day of April, 2012.

2

3                                         s/ Walter E. Barton
                                          Walter E. Barton, WSBA # 26408
4                                         Karr Tuttle Campbell
                                          1201 Third Avenue, Suite 2900
5                                         Seattle, Washington 98101
                                          Telephone: (206) 223-1313
6                                         Fax: (206) 682-7100
                                          E-mail: gbarton@karrtuttle.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR
GROSS NEGLIGENCE, NEGLIGENCE AND
BREACH OF FIDUCIARY DUTY - 54
#843283 v1 / 44469-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*

1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100